**Willie L. METCALF, Plaintiff,**

v.

**OMAHA STEEL CASTINGS CO., Defendant.**

Civ. No. 79–0–271.

United States District Court,
D. Nebraska.

Feb. 4, 1981.

See also, D.C., 476 F.Supp. 870.

Mary Kay Green, Omaha, Neb., for plaintiff.

Michael G. Helms, Omaha, Neb., for defendant.

ROBERT V. DENNEY, District Judge.

This is an employment discrimination case brought pursuant to 42 U.S.C. § 2000e and 42 U.S.C. § 1981. The plaintiff alleges that the defendant discriminated against him because of his race. This case was tried to the Court on October 1, 2 and 3, 1980. The following discussion constitutes the Court's findings of fact and conclusions of law.

I. *Background and Uncontroverted Facts*

The plaintiff, Willie L. Metcalf, is a black citizen and a resident of Omaha, Nebraska. The defendant, Omaha Steel Castings Co. [Omsteel], is a Nebraska corporation. Its principal place of business is in Omaha, Nebraska. Metcalf was employed by Omsteel from August 22, 1972, until his discharge on July 6, 1977. Immediately prior to his discharge, Metcalf worked in Omsteel's foundry as a melter at a wage rate of $5.48/hour, plus time-and a-half pay for overtime.

On July 5, 1977, Metcalf was working on Omsteel's second shift, which began at about noon. The shift was scheduled to end once the day's planned production output had been completed (i. e., a total of 14 "heats" for that day's two shifts). The first shift at Omsteel was more structured. It began in the early morning hours and ended about noon. The first shift was supposed to complete one-half of the day's planned production output. However, if the first shift failed to reach that output goal, the second shift generally had to work until all of the day's projected output was finished. Consequently, the first shift was desirable for its regularity. On the other hand, the second shift was desirable for its overtime pay potential.

There is little dispute that Metcalf was in fact not feeling well on July 5, 1977. He suffered from a pre-existing sinus and respiratory problem. Metcalf visited a doctor that day and was treated for allergies. Nonetheless, he reported to work for his assigned shift at noon.

The incident which gave rise to this lawsuit occurred about 8:30 P.M., when Metcalf left the Omsteel foundry without first obtaining his supervisor's permission. Metcalf refused to run the final scheduled heat of the day. The second shift leadman, Charles Lee, also a black man, made a telephone call to the home of Omsteel's foundry superintendent, Cliff Gosch. Lee asked Gosch how he should deal with the situation. Gosch directed Lee to stop production, to send all of the remaining foundry workers home, and to wait until Gosch came to the foundry. Gosch so instructed Lee because Metcalf was the only fully qualified union melter on duty that evening.

Metcalf reported for work the next day— July 6, 1977. He was told to go to the Omsteel administrative office to explain his conduct to Ken Stillinger and Bert Baines, both Omsteel managers. Upon the recommendation of Cliff Gosch, Stillinger fired Metcalf on the grounds that he had walked off the job without permission. Omsteel stood by Stillinger's decision to terminate Metcalf, even though, on July 7, 1977, Metcalf submitted a doctor's letter verifying his medical difficulties.

Immediately after Metcalf was terminated, Omsteel promoted Metcalf's former assistant, Shayne Shaw, to fill the vacant melter's position. Shaw, a black, had worked at Omsteel for several months as a melter's helper under Metcalf. Shaw was working the same shift as Metcalf on July 5, 1977.

Metcalf filed a charge of racial discrimination against Omsteel with the Nebraska Equal Opportunity Commission [NEOC] on July 18, 1977 [Ex. # 16a]. Metcalf's

charge was also filed with the United States Equal Employment Opportunity Commission [EEOC] on August 2, 1977 [Ex. # 16b]. The NEOC conducted an investigation and, on January 12, 1979, determined that there was no evidence to credit Metcalf's allegations [Ex. # 12]. After examining the NEOC's findings and record, the EEOC concluded, on March 5, 1979, that there was not reasonable cause to believe that Metcalf's charges were true [Ex. # 13]. On the same date, the EEOC issued a right-to-sue letter to Metcalf [Ex. # 17]. Metcalf filed his complaint in federal court on June 11, 1979 [Filing # 1].

It should be noted that the circumstances surrounding Metcalf's discharge have been addressed in other proceedings. Following his discharge, Metcalf filed an application for unemployment compensation benefits with the Nebraska Department of Labor. On the basis of a finding that Metcalf was properly discharged for misconduct, his claim for benefits was denied by a Department claims deputy. Metcalf appealed that determination to the Nebraska Appeal Tribunal, which reversed the claims deputy's determination and found in Metcalf's favor [Ex. # 33]. Omsteel appealed the Tribunal's ruling to the District Court of Douglas County, Nebraska. The District Court reversed the decision of the Tribunal and reinstated the determination of the claims deputy [Ex. # 34].

Metcalf also filed a grievance against Omsteel through his collective bargaining unit. Metcalf's grievance was arbitrated by Henry M. Grether of the Federal Mediation and Conciliation Service. Grether ruled in Omsteel's favor and denied the grievance [Ex. # 30]. His ruling was premised on a finding that Metcalf was discharged for good cause by reason of his misconduct on the job on July 5, 1977. *Id.*

Aside from some procedural matters discussed below, this case is really very simple and straightforward. The primary factual controversy to be resolved is capable of being put in sharp focus. That is, Omsteel contends that Metcalf was discharged because he walked off the job without permis-

sion. Metcalf concedes that he did leave his assigned post without actually obtaining permission. But, he maintains that he did so only after his immediate supervisor denied him permission, even though being informed that he was ill. Omsteel disputes that Metcalf ever told any of his supervisors that he was ill or otherwise unable to continue working his shift. This case, therefore, hinges almost entirely on the credibility of the witnesses as to what actually transpired at Omsteel on the evening of July 5, 1977.

## II. Defenses Not Related to the Merits

### A. Statute of Limitations

Omsteel has consistently maintained that Metcalf's action should be dismissed for failure to comply with the appropriate statutes of limitation [See Filings # 4, # 8, # 17, and Defendant's Trial Brief at 1]. Omsteel's arguments were fully articulated in the context of its motion to dismiss [Filing # 4]. The Court explained then its holding that Metcalf has indeed complied with the applicable statutes of limitation [Filing # 6]. That explanation need not be repeated here.

### B. Res Judicata

The Court has already mentioned that Metcalf's allegations of race discrimination have been the subject of several prior investigations, hearings and determinations. That is, before his case reached federal court, Metcalf obtained unfavorable decisions from the Nebraska Department of Labor, the District Court of Douglas County, Nebraska, the NEOC, the EEOC, and a federal labor arbitrator.

Omsteel maintains that the prior adverse determinations of Metcalf's allegations should bar the present suit under the doctrine of res judicata [Defendant's Trial Brief at 3]. While Omsteel offers some precedent to support its argument, it fails to cite the case of *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8th Cir. 1980), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980). In light of

*Gunther,* Omsteel's argument is untenable. Thus, no further discussion of the res judicata defense is warranted.

### C. *Subject Matter Jurisdiction*

■ Metcalf was discharged on July 6, 1977. On July 18, 1977, he filed a complaint with the NEOC [Ex. # 16a]. Fifteen days later, on August 2, 1977, Metcalf filed an identical complaint with the EEOC [Ex. # 16b]. Omsteel contends that the filing of Metcalf's complaint with the federal agency such a short time after filing with the state agency deprives the Court of subject matter jurisdiction over this lawsuit. This contention follows from Omsteel's assertion that the dual filing within that fifteen day period was afoul of 42 U.S.C. § 2000e–5(c), which provides:

In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, *no charge may be filed under subsection (b) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law,* unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

*Id.* (emphasis added).

The Court agrees with Omsteel that compliance with 42 U.S.C. § 2000e–5(c) is a jurisdictional prerequisite to a federal court suit. But, the Court disagrees with Omsteel's assertion that the statutory provision bars this suit. Of the 60-day deferral rule, it has been stated:

Although, on its face, Title VII prohibits filing charges with the EEOC before the expiration of the 60-day deferral period or the termination of state or local proceeding whichever comes first, the deferral requirement has been interpreted to allow the filing of a charge with the EEOC prior to or during the deferral period. In *Love v. Pullman* [404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972)], a charging party filed a charge with the EEOC without resorting to state remedies. To insure compliance with Title VII procedural requirements, the EEOC orally advised the Colorado Civil Rights Commission that it had received a complaint from the charging party. Prior to the expiration of the 60-day deferral period, the Colorado Commission informed the EEOC that it waived the opportunity to take further action on the grievance, and the EEOC then proceeded with its investigation. The EEOC investigation resulted in a finding of reasonable cause to believe the charge correct, and after an unsuccessful attempt to conciliate, a lawsuit was brought. The defendant-employer averred that allowing a charging party to file with EEOC before recourse to state remedies violated the provision "no charge may be filed ... before the expiration of 60 days after proceedings have been commenced under State or local law ...." The Supreme Court rejected such a narrow reading of the statute, holding:

"[T]he filing procedure followed here fully complied with the intent of the Act.... Nothing in the Act suggests that the state proceedings may not be initiated by the EEOC acting on behalf of the complainant rather than by the complainant himself, nor is there any requirement that the complaint to the state agency be made in writing rather than by oral referral."

Allowing the EEOC to hold charges in "suspended animation" and then automatically to assume jurisdiction after the deferral period, the Supreme Court held that to require a charging party to file a second charge at the termination of the deferral period would serve no other purpose than to create procedural technicalities inappropriate in a statutory scheme in which laymen initiate the process. The automatic deferral procedure approved in *Love* is now embodied in the EEOC's regulations [29 C.F.R. § 1601.12(b)].

Following similar logic, other courts have held that charges are properly filed with the EEOC after the commencement of state or local proceedings and during the deferral period, so long as the state or local agency is given an exclusive opportunity to resolve the problem within the statutory period.

2 A. Larson, *Employment Discrimination* § 48.12, pp. 9A–11 to 9A–14 (1980) (footnotes omitted).

In this instance, the local agency did in fact investigate plaintiff's allegations before the federal agency took any action. Thus, the Court feels that plaintiff has complied with the jurisdiction prerequisites of 42 U.S.C. § 2000e–5(c), i. e., as those prerequisites have been construed by other federal courts.

### III. *Omsteel's Objection to Metcalf's Amended Complaint*

In his administrative charges, Metcalf alleged that individually his discharge constituted racially motivated disparate treatment.[1] The NEOC's determination of Metcalf's charge only addressed whether *he* was discriminated against [Ex. # 12]. The EEOC's determination amounted to general approval of the NEOC's findings [Ex.

# 13]. Although Metcalf's ostensibly pro se complaint in this federal court suit does allege that white employees had left their jobs without being terminated, the pleading again clearly rests on the premise that Metcalf individually was the victim of racial discrimination [Filing # 1]. Subsequent to filing that complaint, Metcalf obtained legal counsel [Filing # 10], who later signed and approved a pretrial order which indicates that the only pertinent unresolved factual question is "[w]hether *the plaintiff's* discharge from employment by the defendant was discriminatory against the plaintiff by reason of race or color" in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e [Filing # 17].

During her opening statement, Metcalf's attorney announced for the first time to the Court and Omsteel's counsel her intention essentially to establish that Omsteel had engaged in a pattern and practice of subjecting its black workers to disparate treatment in regard to various aspects of employment [Tr. 3:12–22]. Omsteel's attorney objected to the expanded scope of proposed proof [Tr. 5:12 to 6–22]. Later, Metcalf's attorney moved for leave of Court to file an amended complaint in order to focus on the allegations of broad based discrimination [Tr. 20:12–13]. Over objection [Tr. 20:21 to 21:16], the Court granted the motion to amend, and allowed the amended complaint to be conditionally received [Tr. 21:17–21]. The Court suggested that the amendment issue should be more fully developed by the respective parties' final written arguments. *Id.* For the reasons set forth below, the Court is now convinced that Metcalf should not be allowed to have the evidence adduced at trial viewed in the primary context of his amended complaint. Thus, the

---

1. In pertinent part, the factual allegations of Metcalf's state and federal administrative complaints are identical. He charged:

> On or about July 6, 1977, I was terminated from Omaha Steel for walking off the job. July 5, 1977, on reporting to work I told my supervisor (Ben) that I did not feel well, and would leave after eight (8) hours of work, which after completing eight (8) hours of work I left for the rest of the day.

> Richard Philbins Jr., White, left the job without telling anyone that he was leaving and did not recieve [sic] a repremand [sic] nor termination. Therefore, I contend that my termination was based on my Race (Negro) and Color (Black).

[Exs. # 16a and # 16b, respectively].

Court's earlier ruling conditionally receiving that pleading is hereby vacated.

Before getting into the legal principles applicable to this amendment issue, it helps to simply compare the nature of plaintiff's original complaint and the proposed amendment [Filings # 1 and # 22, respectively]. Mildly put, they appear as different as night and day. From a standpoint of common sense and fairness, there can be little doubt that defense counsel was totally unprepared to counter the primary kind of proof Metcalf's attorney wanted to adduce at trial, even assuming that Metcalf was legally entitled to amend. Because of this, the Court ruled at trial that, if the amendment was unconditionally received subsequent to trial, Omsteel would be given an opportunity to reopen the record in order to defend against the expanded allegations [Tr. 57:6–23].

Both Metcalf and Omsteel cite the case of *Jiron v. Sperry Rand Corp. (Sperry-Univac)*, 423 F.Supp. 155 (C.D.Utah 1975) to support their respective positions. The Court agrees with the parties that *Jiron* contains perhaps the best analysis of this type of problem. The Court therefore adopts the analysis of that case for purposes of this lawsuit.

After discussing the competing policy interests involved in Title VII amendment disputes, the *Jiron* court refers to the leading case of *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970). Setting the standard by which courts have evaluated such disputes, *Sanchez* stated that "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Sanchez v. Standard Brands, Inc., supra*, 431 F.2d at 466. Most courts have liberally construed the *Sanchez* standard in order to protect lay litigants who presumedly are unfamiliar with the niceties of pleading. *Jiron v. Sperry Rand Corp. (Sperry-Univac), supra*, 423 F.Supp. at 159. However, this does not mean that amendment is always allowed. Nor does it mean that defendants should be exposed to undue surprise by variant allegations at trial in federal court. In *Jiron*, Judge Anderson stated:

A functional approach to applying the *Sanchez* standard in specific cases is to consider whether the purposes of the preliminary administrative process are satisfied. Thus, in evaluating whether "the scope of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," *the most important considerations are whether the defendant had sufficient notice from the administrative charge of the alleged kinds and areas of discrimination and whether the administrative agencies and employers involved had an opportunity to work on a conciliation agreement for voluntary compliance in the challenged areas.*

*Jiron v. Sperry Rand Corp. (Sperry-Univac), supra*, 423 F.Supp. at 159 (emphasis added).

Metcalf contends that the two functional considerations relevant to the *Sanchez* standard are satisfied in this case. That is, Metcalf maintains that Omsteel had sufficient notice of the broader based allegations, and also that Omsteel had an opportunity to work on a conciliation agreement for voluntary compliance in the challenged areas. [Final Written Argument and Brief of Law on Behalf of Plaintiff at 3–4]. The record just does not support Metcalf's contentions. Therefore, the Court concludes that Metcalf's case should be considered primarily on the basis of his original complaint, and not on the basis of the proposed amendment.

█ A brief word should be said about what the Court's ruling means and what it does not mean. It is obvious from the foregoing discussion that the proof at trial must be viewed in the context of plaintiff's original complaint. But, this does not mean that the evidence regarding the defendant's overall employment practices is not relevant to the proof of plaintiff's claim of individually disparate treatment. That is, such evidence can be used *in part* to create an inference of "pretext." *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–

05, 93 S.Ct. 1817, 1825–26, 36 L.Ed.2d 668 (1973) (an employer's "general policy and practice with respect to minority employment" is relevant to a showing of pretext). Therefore, the expanded scope of evidence is relevant, but only at a later stage in the Court's analysis of Metcalf's case.

## IV. *Framework for Analysis*

Metcalf's complaint [Filing # 1] clearly alleges that Omsteel subjected him to disparate treatment on account of his race. In *McCosh v. City of Grand Forks*, 628 F.2d 1058 (8th Cir. 1980), the Eighth Circuit discussed the comparative methods of proving disparate impact and disparate treatment in Title VII cases. Of the disparate treatment proof methodology, the court said:

First, the plaintiff must show the existence of "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Const. Co. v. Waters, supra,* 438 U.S. at 576, 98 S.Ct. at 2949 [57 L.Ed.2d 957], *citing Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). Once a plaintiff establishes this prima facie case, the burden shifts to the employer to rebut the adverse inference by articulating "some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). But even if the employer meets this burden, the complaining party is given the opportunity to show that the proffered evidence is merely a pretext for discrimination. *Id.* at 804–05, 93 S.Ct. at 1825. *See generally Kirby v. Colony Furniture Co., supra.*

*Id.* at 1062 (footnote omitted).

■ This general framework deserves a somewhat more detailed explanation. The central focus of inquiry in a suit involving race discrimination is "whether the employer is treating 'some people less favorably than others because of their race.'" *Furnco Construction Corp. v. Waters,* 438

U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). The plaintiff has the initial burden of proving certain behavior by the defendant from which the trier of fact may infer that the defendant's actions were racially motivated. *Id.* at 576, 98 S.Ct. at 2949. A prima facie case of race discrimination is usually established by plaintiff's showing

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824. Although the *McDonnell Douglas* case involved a suit under 42 U.S.C. § 2000e, the standard set out in that case may also be used to determine whether the plaintiff has established a prima facie case of race discrimination under 42 U.S.C. § 1981. *See Scott v. University of Delaware,* 601 F.2d 76, 79 n.2 (3rd Cir. 1979), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979).

■ Proof of a prima facie case under *McDonnell Douglas* should not be equated with a factual finding that the defendant's actions were racially motivated. Rather, a prima facie showing merely raises an inference of discriminatory animus. This inference of discrimination arises

only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.... And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his

decision on an impermissible consideration such as race.

*Furnco Construction Corp. v. Waters, supra,* 438 U.S. at 577, 98 S.Ct. at 2949. Thus, once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to produce evidence which refutes the plaintiff's showing.

■ To meet this burden, the defendant has two options. *Mosby v. Webster,* 563 F.2d 901, 903–04 (8th Cir. 1977). First, it can offer evidence which disproves the existence of the factual basis of the plaintiff's prima facie case. *Id.* If the defendant is successful in disproving the plaintiff's case, the plaintiff would have failed to carry his initial burden and the defendant would prevail. The defendant's second option is "[t]o dispel the adverse inference from a prima facie showing under *McDonnell Douglas*" by merely articulating "'... some legitimate, nondiscriminatory reason ...'" for the defendant's actions. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 24, 99 S.Ct. 295, 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters, supra,* 438 U.S. at 578, 98 S.Ct. at 2950. The *Sweeney* case makes clear that the plaintiff's prima facie showing does not shift to the defendant the burden of proving the absence of discriminatory motive. *Board of Trustees of Keene State College v. Sweeney, supra,* 439 U.S. at 24, 99 S.Ct. at 295. Rather, it merely shifts to the defendant the burden of producing evidence which dispels the inference created by the plaintiff's prima facie case. *Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106, 108 (1st Cir. 1979), *on remand from Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980). If the defendant does produce evidence of a legitimate, nondiscriminatory justification for his acts, the plaintiff must be given an opportunity to prove that the defendant's proffered justifications are merely pretext. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804, 93 S.Ct. at 1825.

■ In summary, therefore, the ultimate factual issue to be resolved in this case is whether Omsteel's treatment of Metcalf was racially premised. Proof of discriminatory motive is essential, although it can be inferred from the existence of certain facts. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977). Regardless of the manner of proof, the ultimate burden of persuasion always remains on the plaintiff. *Sweeney v. Board of Trustees of Keene State College, supra,* 604 F.2d at 108. This Court must, therefore, determine whether Metcalf has shown by a preponderance of the evidence that Omsteel discriminated against him because of his race.

■ For purposes of creating a good analytical framework, it is important to note that this is a discharge case, as opposed to a refusal-to-hire case like *McDonnell Douglas.* At one time, there was some confusion in the Eighth Circuit as to whether the *McDonnell Douglas* prima facie case guidelines applied to disparate treatment/discharge cases. *See Stevens v. Junior College District of St. Louis—St. Louis County,* 548 F.2d 779, 781 (8th Cir. 1977); *King v. Yellow Freight System, Inc.,* 523 F.2d 879, 882 (8th Cir. 1975). However, it now appears that, with appropriate modifications, the *McDonnell Douglas* standards are applicable to Title VII discharge cases. The Eighth Circuit's acquiescence to the *McDonnell Douglas* methodology is evidenced in *Osborne v. Cleland,* 620 F.2d 195 (8th Cir. 1980). Chief Judge (then Circuit Judge) Lay, speaking for the court, stated that a prima facie showing in a racially oriented Section 2000e disparate treatment/discharge suit was sufficient if the plaintiff demonstrated (1) that he was black, (2) that he was demonstrably capable of performing his employment duties, (3) that he was discharged, and (4) that his employer sought people with his qualifications to fill his former job after his discharge. *Id.* at 197–98. If these four elements are present, the plaintiff successfully raises an inference that racial discrimination motivated the discharge. *Id.* at 198.

Before proceeding with a discussion of the controverted facts of this case, the Court notes that Metcalf has already made out a prima facie showing of disparate treatment. This is made apparent by simply viewing the uncontroverted facts of this case in light of *Osborne v. Cleland, supra.*[2]

## V. *Findings of Fact*

The Court has already determined that Metcalf has established a prima facie case of racial discrimination under *Osborne v. Cleland*, 620 F.2d 195 (8th Cir. 1980). As opposed to offering evidence to disprove the existence of Metcalf's prima facie case, Omsteel's strategy at trial was clearly designed to dispel the adverse inference from the prima facie showing by articulating a legitimate, nondiscriminatory reason for its actions. In other words, Omsteel attempted to show that Metcalf was fired for leaving the job without permission, and that therefore his discharge was not racially motivated. Metcalf, of course, tried to challenge the veracity of Omsteel's stated reason for the discharge. Metcalf further tried to establish that the explanation proffered by Omsteel was pretextual.

The pivotal factual issue in this case is whether, on July 5, 1977, Metcalf advised his supervisors that he was so ill that he could no longer continue to work. As will be more fully explained below, the Court finds that Metcalf failed to adequately apprise his supervisors of the fact that he was sick and unable to continue working.

Metcalf testified that, on July 5, 1977, at about 8:30 in the evening, while in the presence of his helper, Shayne Shaw, he informed his supervisor, leadman Charles Lee, that he felt ill [Tr. 13:7–17]. Shaw offered some corroboration of Metcalf's account. Shaw testified that, sometime near the start of the second shift, Metcalf told him that he was feeling ill [Tr. 134:1–11]. But, Shaw's testimony as to the nature of the conversation that took place between Metcalf and Lee is inconsistent. For in-

stance, when first asked whether he heard Metcalf tell Lee that he was sick, Shaw testified that, as he approached the two men, he heard Lee say that "someone" would have to run the next scheduled heat of steel [Tr. 134:18 to 135:17]. When asked essentially the same question again, Shaw went further and stated that he heard Metcalf tell Lee that he did not "feel good" [Tr. 136:11–14]. On cross-examination, Shaw still contended that he heard Metcalf tell Lee that he was sick [Tr. 138:2–9]. However, Shaw's credibility was seriously impeached when he admitted that he never approached any of the Omsteel managers about the conversation that he had overheard. It was not until an arbitration hearing on November 28, 1977, that Shaw revealed what he says he heard on the evening of July 5, 1977 [Tr. 141:6–19]. Even though nobody at Omsteel ever directly asked Shaw if he had any pertinent information [Tr. 141:25 to 142:15], the Court thinks it a bit strange that he did not volunteer sooner his version of what took place.

Metcalf also testified that, shortly after he reported for work on July 5, 1977, he advised another one of his supervisors that he was feeling ill that day. Metcalf claims that he so informed Benru Chakraborty, Omsteel's chief metallurgist [Tr. 89:15 to 90:9]. Metcalf, though, does not claim that anyone witnessed this conversation [Tr. 90:15–16].

Omsteel offered the testimony of Charles Lee and Benru Chakraborty to counter Metcalf's testimony. Lee, who is black like Metcalf, was present in the courtroom when Metcalf said that he advised Lee that he was sick [Tr. 259:2–5]. Lee flatly rejected Metcalf's testimony, stating that Metcalf gave him no indication about feeling sick [Tr. 259:6 to 260:9]. According to Lee, Metcalf simply said he was not going to run another heat of steel [Tr. 267:1–11]. Lee also stated that he had no prior knowledge of Metcalf's respiratory problems [Tr. 267:18–19].

---

**2.** It is obvious that the first three prima facie elements are present. The Court further feels that, in regard to the last element, it is reasona-

ble to infer from the evidence that Metcalf's helper, Shayne Shaw, was qualified to fill plaintiff's position immediately after the discharge.

Benru Chakraborty, the Omsteel Metallurgist, is a native of India [Tr. 210:21–25 and 212:5–9]. He has supervisory control over the melters and ladlemen in the Omsteel foundry [Tr. 212:22–23]. Chakraborty verified that he and Metcalf conversed about noon on July 5, 1977 [Tr. 221:1–4]. Chakraborty said that Metcalf appeared to him to be in good health [Tr. 221:24 to 222:5]. Like the leadman, Charles Lee, Chakraborty had heard Metcalf's earlier testimony to the effect that Chakraborty was told of Metcalf's illness [Tr. 222:10–11]. Also like Lee, Chakraborty denied that any such conversation ever took place [Tr. 222:14–15]. Chakraborty also testified that he and Shayne Shaw spoke together on July 6, 1977, the day after Metcalf walked off the job [Tr. 225:1–3]. Shaw was asked about what had happened with Metcalf [Tr. 225:7–13]. Shaw supposedly replied: "Man, I don't know." [Tr. 225:14–16]. Shaw did not volunteer any information to Chakraborty about Metcalf being ill the night before [Tr. 225:17–21].

This review of the testimony suggests that somebody is not telling the truth, or, at the very least, somebody's recollection of what happened three years hence is a bit fogged. Very simply put, this case comes down to the credibility of Willie Metcalf and Shayne Shaw versus that of Charles Lee and Benru Chakraborty. In addition to having closely observed the demeanor of the various witnesses during trial, the Court has carefully studied and reviewed the record. The Court simply believes that the testimony of Charles Lee and Benru Chakraborty is more credible than that of Willie Metcalf and Shayne Shaw. Therefore, Omsteel has really gone further than required by the guidelines in *Board of Trustees of Keene State College v. Sweeney, supra,* i. e., as opposed to "merely articulating" a legitimate, nondiscriminatory reason for Metcalf's discharge, Omsteel has *proved* by a preponderance of the evidence that Metcalf's insubordination was the actual reason for his discharge.

Now it is necessary to consider Metcalf's contention that insubordination was merely pretextual in relation to his discharge. During the trial of this case, Metcalf's attorney painted with a broad brush in an effort to demonstrate that Omsteel oversees a racially oppressive work environment. As mentioned before, under *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 804–05, 93 S.Ct. at 1825–26, Omsteel's "general policy and practice with respect to minority employment" is quite relevant to a showing of pretext. But, with specific regard to Omsteel's treatment of employees who complain of sickness, Metcalf was not able to adduce evidence showing that any employee, black or white, had ever been refused permission to leave work after informing a supervisor that he was ill.

Evidence of a statistical nature was also presented by Metcalf in order to help establish pretext. The *McDonnell Douglas* case makes it clear that such evidence may be used to show pretext. But, the Supreme Court cautioned that "such general [statistical] determinations, while helpful, may not be in and of themselves controlling as to an individualized ... decision, *particularly in the presence of an otherwise justifiable reason*" for the discharge. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 805 n.19, 93 S.Ct. at 1826 n.19 (emphasis added).

Metcalf's statistical evidence [Exs. # 1, # 2, # 3, # 4, and # 5] tends to show that the section of the Omsteel foundry where Metcalf worked was staffed almost entirely by black employees, whereas other presumedly more desirable sections of the foundry were staffed predominantly with white employees working for higher wages. Based on the record as a whole, though, and particularly in light of the proven justifiable reason for Metcalf's discharge, this bare statistical presentation is simply too inconclusive to prove pretext.

## VI. Conclusions of Law

Metcalf quite easily established his prima facie case. Omsteel not only *articulated* a nondiscriminatory reason for Metcalf's discharge, Omsteel successfully proved that Metcalf left his job post without first obtaining permission, and that on account of

this he was fired. Finally, Metcalf fell woefully short of establishing pretext. Therefore, Metcalf has failed to carry his burden of proof.

### VII. *Closing Note*

During the trial of this matter, Metcalf's attorney indirectly implied that some of the personnel records produced by Omsteel had been tampered with by either Omsteel or Omsteel's attorney [Tr. 190:4 to 194:3]. There is no doubt that there is in fact a discrepancy in the records, i. e., records produced at an earlier deposition appeared slightly different from those offered at trial. Despite the fact that the record clearly indicates that the personnel records had only been brought up to date prior to trial [Tr. 199:25 to 204:14], Metcalf's attorney persisted with the bitter innuendo that her courtroom adversary had improperly "doctored" these records [Plaintiff's Post-Trial Reply Brief at 3–5]. Without unduly belaboring the point, the Court would like to clarify the record; that is, in the Court's considered opinion, it is obvious that neither Omsteel nor Omsteel's counsel did anything improper. Omsteel and its counsel deserve to have the record purged of any suggestion of impropriety.

### VIII. *Conclusion*

For all of the reasons discussed above, the complaint filed herein should be dismissed. An order shall issue contemporaneously with this Memorandum.