Miguel G. RAMIREZ, Plaintiff,

v.

The CITY OF OMAHA, a municipal corporation; Al Veys, Mayor; Larry Wewel, former Personnel Director; William McDonnell, Public Safety Director; Vernon Van Scoy, Jr., Fire Chief; and Robert Thorsen, Police Officer; individually and in their official capacities, Defendants.

Larry G. LEEDS, Plaintiff,

v.

The CITY OF OMAHA, a municipal corporation; Larry Wewel, former Personnel Director; William McDonnell, Public Safety Director; Vernon Van Scoy, Jr., Fire Chief; Robert Thorsen, Police Officer; individually and in their official capacities, Defendants.

Civ. Nos. 78–0–193, 78–0–348.

United States District Court,
D. Nebraska.

May 19, 1981.

8

Clyde A. Christian, Omaha, Neb., for plaintiffs.

Patrick W. Kennison,[1] Omaha, Neb., for defendants.

MEMORANDUM

DENNEY, Senior District Judge.*

_____

1. Patrick Kennison was Asst. City Atty., Omaha, Neb., for the City of Omaha at the time of trial. He is now engaged in private practice with the law firm of Kutak, Rock & Huie, in Omaha, Nebraska.

* District Judge when case was tried.

I. *Introduction*

These cases[2] involve charges of employment discrimination by the City of Omaha against Miguel G. Ramirez and Larry G. Leeds. The plaintiffs are both Mexican-Americans who applied to the City of Omaha for jobs as firefighters. They claim that they were discriminated against because of their national origin. More specifically, they challenge the defendants' use of admissions that they made during polygraph examinations to reject their applications. Plaintiffs contend that the defendants' refusal to hire them is actionable under 42 U.S.C. §§ 1981, 1983 and 2000e et seq. These cases were tried to the Court, sitting without a jury. This Memorandum constitutes the Court's findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

II. *Background and Uncontroverted Facts*

The parties agree on the following facts [Filing # 88 in "Ramirez"; Filing # 53 in "Leeds"].[3] On August 2, 1976, an examination announcement for the position of firefighter for the City of Omaha was posted.[4] Applications for the job were closed on August 31, 1976. The announcement listed the requirements for the job as well as the elements of the examination process. The examination process consisted of the following components: a written test, a physical fitness test, a personal interview, a polygraph test, a medical examination, a psychiatric examination, and a heart and lung stress test. Candidates were required to pass all portions of the examination process in order to be appointed.

Miguel Ramirez applied for employment with the City of Omaha as a firefighter on August 17, 1976. On August 23, 1976, Larry Leeds filed a similar application. At the time they filled out their respective applications, both men were interviewed to determine if they had the minimum qualifications to go through the examination process.

On September 2, 3, 7, 8, and 9, 1976, written examinations for the position of firefighter were given. A cut-off or passing score was established for the written examination. Those applicants who made a qualifying score on the written examination were allowed to take the physical fitness examination. Scores on the written and physical fitness tests were combined for a total score to which veteran's preference points, if applicable, were added. An "eligible list" was established from those passing both tests.[5]

During the period from August 2, 1976, through August 31, 1976, there were 776 applicants to take the firefighter examination. The applicants categorized by national origin were as follows:

| | |
|---|---|
| White applicants | 667 |
| Hispanic applicants | 24 |
| Other minorities | 85 |

An eligible list was established from those passing both the written and physical

---

2. These cases originally were filed separately. About a year later, though, they were consolidated for purposes of trial [Filing # 67 in "Ramirez"; Filing # 28 in "Leeds"].

3. Substantially all of these facts are taken directly from the pretrial orders. But, the footnotes in this section of the Memorandum, which are designed to flesh out certain details, are supported by information contained in the trial transcript. Therefore, the statements in those footnotes should be regarded as part of the Court's findings of fact.

4. In order to recruit firefighter candidates, the City distributed a copy of the job announcement to approximately eighty agencies on a

distribution list [Tr. 402:2–13; Ex. # 29]. In addition, the City personally notified persons who had previously indicated an interest in the job [Tr. 402:20 to 403:4]. Miguel Ramirez received such personal notification in August of 1976 [Tr. 196:20 to 197:8].

5. To properly understand this case and the hiring procedures involved, it is critical to keep in mind the role of this "eligible list," i.e., as will soon become very evident, the rank of an applicant on this list played a large role in referral for additional testing and, thus, hiring opportunities.

fitness examinations. All firefighters appointed from 1976 to 1978 were appointed from *one* eligible list dated October 11, 1976, and reemployment lists. The eligible list was extended for one year by action of the Omaha Personnel Board pursuant to city ordinance. Miguel Ramirez ranked No. 14 on the 1976–1978 eligible list. Larry Leeds ranked No. 262.

Position on the eligible list was determined by the total score on the various tests with tie scores broken by the date of application, the earlier date receiving preference. Position on the list determined the order in which candidates were referred to the Fire Division for consideration for selection.

From the eligible list names were submitted by the Personnel Department in response to a request from the Fire Division indicating the number of firefighter vacancies available.[6] For each request, names equal to twice the number of vacant positions were submitted, with 40% of the referrals being minorities.[7]

One eligible list for 1976 to 1978 was compiled.[8] It was dated October 11, 1976. From that eligible list, four "classes" or groups of firefighters were hired. Those groups were hired on July 16, 1977, July 17, 1978, October 15, 1978, and October 23, 1978.[9]

The date for the position for which plaintiffs applied was made available on November 1, 1976, by a request to fill eleven vacancies. The Fire Division's first Personnel Requisition was dated October 14, 1976. Miguel was referred with this group of names. He was not hired. Appointments from this referral were effective on July 16, 1977. Larry Leeds was not referred for these vacancies, since his position on the eligible list, No. 262, did not permit the referral of his name at that time. Mr. Leeds' name was referred on a requisition for twenty vacancies on April 19, 1978. However, Mr. Leeds was not hired. The appointments made from this referral were effective on July 17, 1978. A final referral was made on August 8, 1978, and the hiring of twenty-eight firefighters was completed on October 23, 1978.[10]

Selection of firefighters was made by the Fire Division from the list of eligible candidates referred. After a candidate had been referred, he was given a structured interview by a board of Fire Division officers as well as a polygraph examination.[11] Final review of a candidate's file was completed by a panel of Fire Division officers.

6. Names were submitted in response to three requests for firefighters. Those requests were made on October 14, 1976 [Ex. # 55], April 12, 1978 [Ex. # 55(a)] and July 28, 1978 [Ex. # 55(b)].

7. The Fire Division, as a hiring department, made its requests to the Personnel Department by filing "P–20" forms. A P–20 was simply a requisition form which indicated the number of authorized openings [Tr. 405:2–8]. The three exhibits mentioned in footnote 6, *supra*, are P–20 forms. When persons were hired or rejected off a P–20 form, additional names were referred [Tr. 407:12–18]. Names were then sent in the same racial percentage as originally referred so that minorities replaced minorities [Tr. 407:19 to 408:1]. This procedure resulted in maintaining a 40% minority referral rate [Tr. 407:24 to 408:1]. If a minority referral was rejected by the Fire Division, his name was replaced with the next highest minority on the eligible list [Tr. 408:2–6].

8. Ex. # 30 represents the 1976–78 eligible list. Pursuant to city ordinance, an eligible list can last a *maximum* of two years [Tr. 408:7–13].

9. The City hired firefighters in "classes" because it was considered cost-efficient. That is, in view of the intensive training which was involved, it was thought preferable to train groups of persons rather than individuals [Tr. 408:25 to 409:7].

10. Miguel Ramirez was referred on each of the three referrals [Exs. # 55, # 55(a), and # 55(b)]. Due to his lower rank on the eligible list, Larry Leeds was only referred on the latter two referrals.

11. By stipulation subsequent to trial [Filing # 104 in "Ramirez"; Filing # 69 in "Leeds"], counsel have informed the Court that the defendants no longer use the polygraph examination as a component in screening firefighter applications. This decision was prompted by and is in accordance with *Neb.Rev.Stat.* § 81–1932 (Cum.Supp.1980).

Candidates who successfully completed the written, physical and polygraph phases were notified that they could participate in the medical, psychiatric, and stress testing phases of the screening process. Upon successful completion of all phases of the examination process, candidates were hired.

The breakdown of persons eligible, referred and hired from the Firefighters Eligible List, 1976–1978, was as follows:

|  | White Males | Mexican-American Males | Others | Total |
|---|---|---|---|---|
| Eligible | 393 | 13 | 38 | 444 |
| Referred | 138 | 13 | 38 | 189 |
| Hired | 56 | 6 | 2 | 64 |

As a part of the selection process for the position of firefighter in the City of Omaha, it was absolutely required that all eligible candidates for employment submit to a polygraph test.

On November 4, 1976, Miguel Ramirez was given the polygraph examination. On May 12, 1978, Larry Leeds was also given a polygraph examination. Miguel Ramirez and Larry Leeds were not hired as firefighters by the City of Omaha.

### III. *Framework for Analysis*

Plaintiffs contend that they should recover under various legal theories. First, they maintain that the City of Omaha is liable under 42 U.S.C. § 2000e. As to their § 2000e claim, plaintiffs allege both "disparate treatment" and "disparate impact." Second, plaintiffs argue that they can recover against the City under 42 U.S.C. § 1983. Third, plaintiffs have also lodged a § 1983 claim against the individual defendants, who are officials of the City of Omaha. Fourth and finally, plaintiffs assert liability of the individual defendants under 42 U.S.C. § 1981. In order to draw reasonable legal conclusions from the facts already set out, in addition to those that will be discussed in Section IV of this Memorandum, it is necessary for the Court to briefly discuss the principles governing the various theories of relief advocated by the plaintiffs.

### A. *§ 2000e Claim Against the City*

Plaintiffs maintain that the City of Omaha [12] is liable under 42 U.S.C. § 2000e.[13] In *McCosh v. City of Grand Forks*, 628 F.2d 1058 (8th Cir. 1980), the Eighth Circuit explained the different methods of proving cases under § 2000e. The court stated:

> It is well settled that the method of proving an allegation of discrimination in employment under Title VII will differ somewhat depending on whether the Title VII claim is based on a theory of "disparate impact" or "disparate treatment." *Furnco Const. Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Kirby v. Colony Furniture Co.*, 613 F.2d 696 (8th Cir. 1980).

> If the Title VII claim is brought on a theory that a facially neutral employment practice has a "disparate impact" on a "protected group," the initial burden is on the plaintiff to establish a prima facie case through showing that the employer's practices have a discriminatory effect. Once the plaintiff proffers sufficient evidence to show the discriminatory effect or "disparate impact," the burden shifts to the employer to show that the practice has a "manifest relationship to the em-

12. Plaintiffs originally alleged that the individual defendants were also accountable under Title VII. They later conceded that the individual defendants could not be held liable in this manner. The Court therefore granted those defendants' summary judgment motion, but only as to the Title VII claim.

13. The pertinent provision of Title VII states as follows:

> *It shall be an unlawful employment practice for an employer—*
> (1) *to fail or refuse to hire* or to discharge *any individual*, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of such individual's* race, color, religion, sex, or *national origin*: . . . .
> 42 U.S.C. § 2000e–2(a) (emphasis added).

ployment in question," *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), and that the practice is "necessary to safe and efficient job performance." *Dothard v. Rawlinson,* 433 U.S. 321, 332, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977). But even if the employer meets his burden, the plaintiff may still prevail by showing the existence of a reasonable alternative to the discriminatory employment practice which would serve the employer's legitimate interest without a discriminatory effect. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

When, however, an individual alleges that he has been subjected to "disparate treatment" . . ., the standards of proof have been stated somewhat differently. First, the plaintiff must show the existence of "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Const. Co. v. Waters, supra,* 438 U.S. at 576, 98 S.Ct. at 2949, *citing Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). Once a plaintiff establishes this prima facie case, the burden shifts to the employer to rebut the adverse inference by articulating "some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). But even if the employer meets this burden, the complaining party is given the opportunity to show that the proffered evidence is merely a pretext for discrimination. *Id.* at 804–05, 93 S.Ct. at 1825. *See generally Kirby v. Colony Furniture Co., supra.*

*McCosh v. City of Grand Forks, supra,* 628 F.2d at 1061–62 (footnote omitted.[14])

■ While several legal theories have been advocated in this lawsuit, the most pertinent one is that of disparate impact under § 2000e. Counsel have relied to a large extent on various statistics regarding the City's hiring practices. The case of *Green v. Missouri Pacific Railroad Co.,* 523 F.2d 1290, 1293 (8th Cir. 1975), tells us that disparate impact may be established statistically in three ways. The first procedure involves consideration of whether a given class of minorities in a specified geographical area is excluded by the employment practice in question at a substantially higher rate than whites, e.g., by a requirement that applicants have a high school diploma. *Id.* The second procedure focuses on a comparison of the percentage of minority class and white job applicants actually excluded by the employment test. *Id.* at 1294. The third procedure examines the level of employment of the given minority class in comparison to the population percentage of that minority class in the relevant geographical area. *Id.* In the case at bar, the second and third methods of proof are applicable.

As already mentioned, the major point of contention in this lawsuit centers on the defendants' use of polygraph examination reports to reject the plaintiffs' employment applications. But, in considering the parties' statistical proof, it is important to note the firefighter selection process must *first* be viewed as a whole to determine the presence of disparate impact, i.e., if the hiring process as a whole did not have a disparate exclusionary impact on Mexican-Americans, then the fact that they fared less well than whites on the polygraph subtest is insufficient to establish a prima facie case of disparate impact. *See Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396,* 568 F.2d 558, 565 n. 10 (8th Cir. 1977); 29 C.F.R. § 1607.4(C) (1979).[15]

14. For a further, more detailed explanation of this Court's disparate treatment proof analysis, see *Metcalf v. Omaha Steel Castings Co.,* 507 F.Supp. 679, 686–87 (D.Neb.1981).

15. Plaintiffs acknowledge that this type of "bottom line" approach governs this case. Plaintiffs' Final Argument (Post-Trial Brief) at 5.

A significant disagreement in this case involves whether the plaintiffs should be entitled to show disparate impact upon minorities in general, or whether the statistical inquiry should be limited to just Mexican-Americans. The plaintiffs suggest that, for purposes of establishing disparate impact, it is appropriate to consider blacks and Hispanics together. Plaintiffs' Trial Brief at 17–18. In support of this contention, plaintiffs put on testimony to the effect that Ramirez is a very dark-skinned Hispanic and that he is often considered black or "colored" [Tr. 181:2–8]. Further, plaintiffs argue that there is a good "policy" reason for statistically combining blacks and Hispanics, to wit, that there is strong evidence showing that both protected groups were rejected for employment disproportionately as a result of the polygraph examination. Plaintiffs' Trial Brief at 18.

The Court disagrees with the plaintiffs' analysis. Without commenting on the statistical evidence at this point, the Court notes initially that the plaintiffs have failed to cite any specific authority in support of their suggestion regarding combining blacks and Hispanics. Since a more accurate picture of any disparity is usually obtained by *not* grouping certain minorities together, *see* 3 A. Larson, *Employment Discrimination* § 74.64 (1980), the Court opts to reject plaintiffs' suggestion that blacks and Hispanics be considered together for purposes of statistical analysis of disparate impact.

### B. § 1983 Claim Against the City

■ Plaintiffs' § 1983 claim against the City is governed by *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The *Monell* case makes it clear that local governing bodies can be sued directly under § 1983 where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. *Id.* at 690, 98 S.Ct. at 2035. Such a § 1983 action may also be brought for constitutional deprivations brought about by governmental "custom", even though said custom has not received formal approval through official decision-making channels. Id. at 690–91, 98 S.Ct. at 2035–36. But, a municipality cannot be held liable under § 1983 merely because it employs a tortfeasor, i.e., the doctrine of *respondeat superior* is inapplicable. *Id.* at 691, 98 S.Ct. at 2036.

■ *Monell* clearly suggests that a city's policy or customs may originate in persons whose actions may be fairly said to represent the city's official policy. In other words, an individual city official, other than the city's lawmakers, can create official policy for the purposes of a § 1983 action. Thus, if a city official with policy making authority designs a hiring procedure with the intent to discriminate against minorities, the city may be liable under § 1983.

As the Court stated when ruling on the defendants' motion for summary judgment, under this analysis, two factual issues must be resolved before the City's liability under § 1983 can be ascertained. First, it must be determined whether the person responsible for developing the hiring procedure for firefighters is a person whose actions can fairly be said to represent the City's official policy. Second, it must be determined whether the person responsible for creating the City's policy with respect to the polygraph examination was motivated by a discriminatory purpose. *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 274–80, 99 S.Ct. 2282, 2293–96, 60 L.Ed.2d 870 (1979) (proof of disparate impact is often insufficient to prove discriminatory intent).

The City has conceded the first issue. In other words, it admits that the hiring procedures for firefighters constituted official policy, regardless of which official or officials designed those procedures. Defendants' Written Argument at 64–65. As to the second issue, however, the City submits that the policy that required firefighter applicants to undergo polygraph examinations was not developed for discriminatory reasons. *Id.* at 65. Therefore, in regard to the § 1983 claim against the City, the pivotal

factual issue is whether a discriminatory purpose supported the City's policy to use the polygraph examination as part of its hiring procedures.

### C. *§ 1983 Claim Against the Individual Defendants*

■ To prove a § 1983 claim of employment discrimination against the individual defendants, the plaintiffs must establish two interrelated facts. First, they must prove the existence of a causal link between the defendants' conduct and the constitutional deprivation suffered. "A defendant will not be held liable under 42 U.S.C. § 1983 unless he was personally involved in causing the deprivation of a constitutional right or he either has or is charged with having actual knowledge that his subordinates are causing deprivations of constitutional rights." *Triplett v. Azordegan*, 570 F.2d 819, 823 (8th Cir. 1978). Second, the plaintiffs must prove that the defendants' actions were motivated by a discriminatory intent or purpose. *Clark v. Mann*, 562 F.2d 1104, 1112 (8th Cir. 1977). The Supreme Court has stated:

> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. See *United Jewish Organizations v. Carey*, 430 U.S. 144, 179 [97 S.Ct. 996, 1016, 51 L.Ed.2d 229] (concurring opinion). It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (footnotes omitted).

Proof of discriminatory intent out of necessity usually relies on objective factors, i.e., the inquiry is a practical one. *Id.* at n. 24, 99 S.Ct. at 2296 n.24. Several of these objective factors are outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977). They include the impact of the official action, the historical background of the decision, the specific sequence of events leading up to the challenged decision, the existence of any departure from the normal procedural or substantive sequence of events, and finally, the legislative or administrative history of the challenged action. *Id.*

### D. *§ 1981 Claim Against the Individual Defendants*

Plaintiffs allege that the individual defendants are liable under 42 U.S.C. § 1981, which provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

For purposes of evaluating the plaintiffs' § 1981 claim, the Court will employ the familiar *McDonnell Douglas* disparate treatment formula.[16] *See Metcalf v. Omaha Steel Castings Co.*, 507 F.Supp. 679, 686 (D.Neb.1981). *But see*, 3 A. Larson, *Employment Discrimination* § 88.30, pp. 18–10 and 18–11 (1980) (suggesting that § 1981 now extends to "neutral" practices which have a discriminatory effect).

### IV. *Findings as to Controverted Facts*

As is evident from Section II of this Memorandum, many of the facts in this

---

**16.** Under this formula, a prima facie showing of discrimination is made if the plaintiff establishes

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

case are uncontroverted. But, in regard to various other aspects of the defendants' hiring procedure, it is necessary for the Court to make formal findings of fact.

A. *Overview of the Defendants' Use of the Polygraph Examination in Screening Firefighter Applicants*

The critical facts of this lawsuit involve the role which the polygraph examination played in the hiring procedure applied to the plaintiffs. It has already been stated that the polygraph examination was given to every firefighter candidate referred off the 1976–1978 eligible list. The polygraph examination generally dealt with background on work history, thefts, morals, use of narcotics, and physical condition [Tr. 159:11–20]. The Omaha Fire Division had no per se policy which operated to reject an applicant on account of his criminal or arrest record [Tr. 159:21 to 160:4], i.e., the information was used only as a guideline or factor in judging the applicants' habits and the way he or she got along with other people [Tr. 160:16 to 161:2]. Insofar as criminal background and the polygraph examination were concerned, the Fire Division apparently was concerned solely with thefts [Tr. 160:5–7]. The actual criminal record of the applicant, if any, was not reviewed in the Fire Division's selection process, except as such records were necessary to verify information admitted by the applicant during the polygraph examination [Tr. 161:11–14 and 330:2 to 331:8].

Fire Chief Vernon Van Scoy, Jr., testified why the subject of theft was covered. He stated that since firefighting involves the presence of firefighters in buildings which might have been abandoned during the fire, the potential for theft of property or money is great [Tr. 161:15 to 162:11]. Therefore, applicants who demonstrate a questionable background in the way of theft or property related criminal behavior need to be closely scrutinized [Tr. 163:7–12].[17]

According to Fire Chief Van Scoy, another area of behavior which was given particular emphasis during the polygraph examination was any unusual tendency on the part of the applicant toward physical aggressiveness or violent behavior [Tr. 163:13 to 164:19]. Firefighters live together on a twenty-four hour basis, with ninety per cent of their time actually spent in the stationhouse [Tr. 163:19–21]. Since they live and work in a communal environment, peace and harmony among the firefighters is imperative [Tr. 164:1–19]. Thus, applicants subjected to the polygraph examination were screened to insure that individuals ill suited to a group living situation would not be hired.

The Fire Division's administration of the polygraph examination involved two phases. The first phase involved a pretest interview. The second phase involved actual attachment of the polygraph machine to the applicant and the running of polygraph charts [Tr. 321:7–14].

During the pretest interview phase, two written forms were completed. One was called the Rights Advisory Form [Exs. # 39 and # 40]. The other was called the Polygraph Pretest Interview Sheet [Exs. # 42 and # 43].

Prior to actually giving the polygraph examination, the polygraph operator (in the plaintiffs' instances, Police Sergeant Robert Thorsen) routinely discussed the topics that would be covered [Tr. 321:24 to 322:1]. As already mentioned, these topics included background on work history, morals, thefts, narcotics, and physical condition [Tr. 159:11–20]. These general areas of examination were developed in the course of Fire Division staff meetings and then communicated to the polygraph operator [Tr. 170:11–15 and 322:7–19]. While the Fire Division instructed Sergeant Thorsen on the general areas to be covered, the actual wording of the questions was left to his discretion [Tr. 322:20 to 323:2].

---

**17.** Plaintiffs point to a potential defect in the City's decision to administer polygraph examinations to firefighter applicants. Even though they seem to concede that persons with a propensity toward theft should not be in buildings without supervision, plaintiffs take offense to the fact that the polygraph examination was not given to city building and housing inspectors, who also are often in vacant structures on official business [Tr. 135:20 to 136:10].

During the pretest interviews administered to plaintiffs and other applicants, Sergeant Thorsen explained the purpose of the examination and how the polygraph machine operated [Tr. 327:2–12]. After giving this explanation, Thorsen interviewed the applicants with regard to the general areas prescribed by the Fire Division [Tr. 332:18 to 333:2]. This part of the procedure, it will be recalled, was completed prior to the time that the polygraph machine was physically attached to the applicant [Tr. 331:15–18]. During the pretest interview, which essentially amounted to a structured but still informal conversation between Thorsen and the firefighter applicant, it was Thorsen's practice to make written notes regarding the topics discussed [Tr. 331:19–22]. Thorsen made these notes on the back of the Polygraph Pretest Interview Sheet [Tr. 331:23–25; Exs. # 42 and # 43].

The next step in the testing procedure involved attachment of the polygraph machine to the applicant [Tr. 323:3–7]. The machine would note and measure certain body reactions to questions asked of the applicant [Tr. 323:14–16 and 391:4–8]. With the general areas of Fire Division interest in mind, the applicants were asked various specific questions from a published master question list commonly used by polygraph examiners [Tr. 333:8–23; Ex. # 44]. Every firefighter applicant was tested with regard to the same areas [Tr. 359:9–12]. These areas were tested irrespective of the applicant's race, national origin, or sex [Tr. 359:13–15]. No notations regarding the race or national origin of the person tested were made on the polygraph operator's reports [Tr. 359:23 to 360:1].

After the polygraph test was completed, the examiner analyzed the polygraph charts [See Exs. # 56, # 56(a), # 57, and # 57(a)]. A report was then made to the Fire Chief on the basis of analysis of the charts and the examiner's pretest interview notes [Tr. 323:3–23].

As already mentioned, Miguel Ramirez was given a polygraph examination on November 4, 1976. Larry Leeds took the examination on May 12, 1978. Based upon admissions made by both men during the pretest interview, as well as the actual polygraph charts, Sergeant Thorsen made his reports to Fire Chief Van Scoy [Tr. 357:16 to 358:1 and 372:22 to 373:3; Exs. # 11 and # 24]. Chief Van Scoy's decision to reject Ramirez and Leeds was premised upon his review of Thorsen's polygraph reports on the two men [Tr. 145:11–18 and 167:1 to 168:4].

### B. Ramirez's Polygraph Examination

The polygraph report submitted by Sergeant Thorsen to Chief Van Scoy regarding Miguel Ramirez [Ex. # 11] states that Ramirez was convicted of assault and battery in October of 1976. The report further indicates that Ramirez admitted that he had recently been involved in a barroom fight and that he had hit another man with a set of brass knuckles. At trial, Ramirez admitted that he had given this information to Thorsen, but that Thorsen failed to give Ramirez any opportunity to explain pertinent extenuating circumstances [Tr. 205:20 to 206:7]. Ramirez testified that he acted in self defense during the fight, that the brass knuckles actually belonged to the other man, and that they just changed hands during an ensuing scuffle [Tr. 191:18 to 192:6].

In regard to thefts, Ramirez's polygraph report states that he had been apprehended by the police on suspicion of possession of stolen property, auto theft, and grand larceny. None of these incidents, however, gave rise to a conviction. Ramirez's testimony indicates that, while he admitted these various matters to Thorsen during the polygraph examination, he failed to make clear his feeling that the charges were unfounded. In other words, it appears that Ramirez merely told Thorsen of the various theft related incidents and arrests, without qualifying his remarks by saying that he did not commit the acts with which he had been charged. Again, though, Ramirez claims that Thorsen failed to provide any opportunity for explanation of mitigating factors [Tr. 211:18–20].

## C. *Leeds' Polygraph Examination*

The polygraph report submitted by Sergeant Thorsen on Larry Leeds [Ex. # 24] states that Leeds made numerous admissions concerning the theft of money and equipment from previous employers. Unlike Ramirez, however, Leeds had no record of any arrests or convictions. At trial, Leeds attempted to explain various admissions which he made during the course of the polygraph examination [Tr. 30–42].

With regard to Leeds' admission during the polygraph examination that he had removed certain equipment from the "Northrup Jones" restaurant while employed there, he testified that he actually sold the equipment at an auction and then put the proceeds into the restaurant's cash register [Tr. 33:5 to 35:4]. The owner of the restaurant during Leeds' employment there, Mr. Sam Marvin, testified on behalf of the defendants. He stated that during the period that Leeds managed the restaurant he suspected that equipment was being removed from the business [Tr. 281:17–21]. The restaurant owner approached Leeds to give him an opportunity to return the equipment [Tr. 281:22 to 282:11]. Leeds did in fact return the equipment [Tr. 282:6–8]. The polygraph examiner, Sergeant Thorsen, testified that Leeds failed to offer any explanation of the mitigating circumstances surrounding the removal of equipment from the restaurant [Tr. 373:14–17].

Thorsen's polygraph report on Leeds states that over an extended period of time he took canned goods valued at several hundred dollars from the Northrup Jones restaurant. The language of the polygraph report is a little misleading. At trial, Leeds testified that what he actually did was sell food to members of his church at the restaurant's wholesale cost [Tr. 35:5–21]. In making these sales of canned goods, Leeds would ring up the cash register receipts under the category of "sandwiches" [Tr. 79:2–8]. Thus, it is Leeds' contention that the restaurant suffered no real financial loss on these transactions. However, Layne Schonlau, Northrup Jones' corporate controller, testified that he was not aware that

such transactions were taking place, and that if they were taking place it was without company authorization [Tr. 107:20 to 109:17]. Sam Marvin, the restaurant owner, agreed with Schonlau on this point [Tr. 284:16 to 285:16]. At any rate, Leeds testified that he explained to Thorsen the extenuating circumstances of these unauthorized (though seemingly innocuous) transactions [Tr. 78:15 to 79:8]. Thorsen, however, vehemently disagreed, i.e., he testified that Leeds never offered any explanation tending to legitimize these unauthorized sales of canned goods [Tr. 373:18–23].

The Leeds polygraph report also states that he put fictitious employees on the Northrup Jones payroll. Again, the report is somewhat misleading. Leeds testified that what he actually did was compensate his teenage daughter, who was employed at the restaurant, for time that she had worked without pay during the previous year [Tr. 36:24 to 37:18]. Leeds did this by "padding" the number of hours which his daughter worked during the year that she was officially on the payroll [Tr. 38:18–23]. Leeds was able to arrange the payroll in this fashion because he had complete control of the restaurant's personnel time records [Tr. 73:12–14]. The restaurant owner testified that he was unaware that Leeds was engaged in this practice of "making up" for hours previously worked by his daughter [Tr. 284:3–10]. Marvin further testified that Leeds lacked the authority to compensate his daughter in this manner, and that it violated the restaurant's normal operating procedure [Tr. 284:11–15]. The corporate controller, Layne Schonlau, generally concurred with Marvin's testimony [Tr. 105:12 to 106:23].

## D. *Involvement of the Individual Defendants*

The main thrust of this lawsuit is directed at the City of Omaha. But, also named as defendants are various city officials, namely, Public Safety Director William McDonnell, Fire Chief Vernon Van Scoy, Jr., former Personnel Director Larry Wewel, former Public Safety Director Richard

Roth, Police Sergeant Robert Thorsen, and Mayor Al Veys. Liability of the individual defendants is asserted under 42 U.S.C. §§ 1981 and 1983. As was explained in Section III of this Memorandum, the crucial element in both of these causes of action is whether the defendants' conduct was motivated by a discriminatory intent or purpose.[18]

At trial, plaintiffs tried to prove the requisite degree of intent by showing that Sergeant Thorsen intentionally misconstrued and misrepresented information developed in his polygraph reports, and, further, that the other defendants intentionally utilized the polygraph examination as a device to avoid hiring Hispanic firefighters. As to the individual defendants other than Thorsen, plaintiffs point to a Personnel Department task force report [Ex. # 8] which indicated that the polygraph examination served as a bar to minority employment. Plaintiffs' Final Argument (Post-Trial Brief) at 9–10.

The Court will deal first with whether plaintiffs proved the requisite intent on the part of Sergeant Thorsen. Not surprisingly, Thorsen testified at trial that he did not intentionally distort or falsify any information given to him during the polygraph examinations administered to the plaintiffs [Tr. 358:17–20]. Neither Ramirez nor Leeds ever actually called into question the information which Thorsen submitted on the polygraph reports relative to the admissions which they had made. Instead, the plaintiffs offered trial testimony concerning additional facts and information tending to explain their prior admissions in a less drastic perspective [Tr. 33:5 to 42:21 and 186:8 to 192:8]. As already mentioned, Sergeant Thorsen testified that the plaintiffs failed to offer such explanations during their ex-

aminations. In opposition, though, plaintiffs testified that Sergeant Thorsen so structured the examination that they really did not have any opportunity to provide explanations of mitigating circumstances.

After listening to all of the testimony and reviewing the transcript of trial proceedings, the Court finds that Sergeant Thorsen did not act with the requisite degree of discriminatory intent. On the one hand, the Court believes that perhaps Sergeant Thorsen should have been more lenient in interpreting the plaintiffs' responses during the polygraph interview. On the other hand, however, it seems that both of the plaintiffs should have made more of an effort to qualify the facially inculpatory comments that they made during their examinations. The Court reaches this conclusion despite recognizing that, by the very nature of the testing procedure, Sergeant Thorsen was able to control the focus and tenor of the interviews. In sum, while it appears that Sergeant Thorsen did not give every benefit of the doubt to the two firefighter applicants, it is clear that his conduct is not indicative of a discriminatory intent or purpose.[19]

As stated above, plaintiffs rely mainly upon a City task force report in trying to demonstrate the requisite degree of intent on the part of the individual defendants other than Sergeant Thorsen. The report, which was prepared by three independent businesspersons in the Omaha community at the request of the City's Personnel Department, recommended "[t]hat the use of a polygraph test for . . . fire employees be discontinued in view of the disparate impact (almost total bar) it is having on racial minorities" [Ex. # 8, p. 11]. The task force report is dated December 1, 1978. On Janu-

18. While this section of the Court's Memorandum addresses itself mainly to the individual defendants in regard to their liability under 42 U.S.C. §§ 1981 and 1983, these facts are also relevant to the latter stages of the case against the City for disparate treatment under § 2000e, i.e., these facts are relevant to articulation of nondiscriminatory purpose, as well as pretext, under the *McDonnell Douglas* formula.

19. In this regard, the Court would have been interested in being presented with evidence regarding the nature of Thorsen's administration of the polygraph examination to white firefighter applicants. That is, if the plaintiffs were able to show that Thorsen interpreted those applicants' answers more leniently and fully, then perhaps the Court would be able to justify a factual finding of discriminatory intent.

ary 23, 1979, the Omaha City Council passed a resolution thanking and commending the individuals who prepared the report [Ex. # 62]. The resolution further stated that the City Council accepted the report and adopted it as part of the City's official record. Finally, the resolution stated that the Council endorsed the "spirit" of the recommendations and encouraged the Mayor to implement them whenever and as quickly as possible.

It is essentially the plaintiffs' contention that the Council resolution amounts to a legislative admission of discrimination within the Fire Division. Further, it seems that plaintiffs wish the Court to infer, with regard to the task force report, that the "foreseeable effects" of continued use of the polygraph examination provides the requisite intent under 42 U.S.C. §§ 1981 and 1983.

There are some flaws in plaintiffs' analysis. First, on its face, the City Council resolution certainly does not constitute a legislative admission of employment discrimination. That is, the Council only *generally* accepted the report; the recommendation regarding use of the polygraph examination constitutes only three lines in a sixty-seven page report. Second, the Council resolution regarding the task force report was passed *after* both plaintiffs were rejected for employment.[20] Therefore, as to the plaintiffs in this case, it is not appropriate to infer discriminatory intent on the part of the individual defendants, even if the Court were to make the considerable assumption that each of those defendants actually read the entire report. Third, as the Court will explain in its statistical analysis below, the conclusion of the task force report appears erroneous, at least insofar as it relates to the hiring of Omaha firefighters from the 1976–1978 eligibility list.

In regard to the intent element of the claims under §§ 1981 and 1983, as well as the defendants' rebuttal burden under the § 2000e disparate treatment claim,[21] certain other testimony of and evidence relating to the individual defendants is noteworthy. Vernon Van Scoy, Omaha Fire Chief, testified as to the reasons why he rejected Ramirez' and Leeds' employment applications. Van Scoy said that Ramirez was rejected on the basis of the information contained in his polygraph examination report [Tr. 145:11–18; Ex. # 11], the contents of which have already been reviewed in this Memorandum. According to Van Scoy, he was not interested in whether an applicant had been arrested or convicted of a certain crime [Tr. 160:20–24]. Instead, Van Scoy was interested in indications of the applicant's habits [Tr. 160:16–19]. In looking at the applicant's habits and the way in which he or she got along with others, Van Scoy testified that he was more interested in the fact that the applicant admitted committing a certain act, rather than in the ultimate criminal disposition of that act [Tr. 161:3–6].

As to applicant Leeds, Van Scoy also rejected him on the basis of the polygraph report from Sergeant Thorsen [Tr. 167:1 to 169:2; Ex. # 24]. The contents of that report also have been discussed in this Memorandum. Chief Van Scoy testified that the rejection of Mr. Leeds had nothing to do with his Mexican-American national origin [Tr. 169:3–5]. In fact, the committee which reviewed Leeds' polygraph report was totally unaware of his national origin [Tr. 169:6–12].[22]

---

**20.** The Court has already pointed out that the resolution was passed on January 23, 1979. Ramirez was rejected in 1976. Leeds was rejected in 1978. Therefore, the resolution clearly was not in existence during the relevant period of the firefighter eligible list, to wit, October 1976 through October, 1978.

**21.** It is fairly evident that the City of Omaha is willing to concede that the plaintiffs have made a prima facie showing of disparate treatment under the. *McDonnell Douglas* methodology,

i.e., the City has opted to attack the disparate treatment claim by articulating a legitimate reason for rejection of the plaintiffs, and by challenging the existence of any evidence showing pretext. *See* Defendants' Written Argument at 54–56.

**22.** The reviewing committee was comprised of four persons—the Director of the Department of Public Safety, the Chief of the Fire Division, and two bureau assistant chiefs [Tr. 157:11–19].

Chief Van Scoy also testified regarding the history of the polygraph examination's use in the Fire Division. The polygraph examination, as a component of the hiring procedure, began in 1972 at the direction of former Public Safety Director Al Pattavina [Tr. 158:12–15]. Van Scoy testified that there was a need to do background checks on potential firefighters in order to identify characteristics and habits relating with exposure to and experience with property related crimes, narcotics, and deviant sexual behavior [Tr. 159:6–20].

Defendant William McDonnell, the City's Public Safety Director, also testified. He stated that the purpose of the polygraph examination was two-fold. First, it was used to determine whether candidates told the truth on their application forms. Second, it was used to determine whether the candidates met the various standards established for firefighters [Tr. 259:5–10]. McDonnell also stated that the polygraph examination was not used as a device to screen out Mexican-American applicants [Tr. 260:12–15]. Finally, he said that there was no written or unwritten policy in the Fire Division designed to prevent minorities from gaining employment [Tr. 260:16–21].

### E. *Firefighter Hiring Statistics*

A major point of contention in this lawsuit involves the relevant time frame for measuring whether there was disparate impact in the City's hiring of firefighters. The defendants contend that the Court should look at the data from the 1976–1978 eligible list in its entirety, i.e., that the list reflects the pertinent "pool" of applicants. Defendants' Written Argument at 33–45. In support of this contention, the defendants point out that both Ramirez and Leeds appeared on the 1976–1978 eligible list. More importantly, the defendants argue, the entire list must be viewed for disparate impact in order to get the most accurate reading of their hiring practices.

The plaintiffs disagree. They maintain that only a certain part of the 1976–1978 hiring statistics should be considered, i.e., from October of 1976 up until June 1, 1978.[23] Prior to June 1, 1978, only one Hispanic had been hired from the 1976–1978 eligible list. After June 1, 1978, five additional Hispanics were hired from that list. Plaintiffs contend that the five Hispanics hired after June 1, 1978, are clear evidence of the defendants' efforts to mask or hide preexisting disparate impact, and that thus those five Hispanics should be disregarded for purposes of the Court's analysis of the plaintiffs' disparate impact claim.

At first, the Court was inclined to agree with the plaintiffs in this matter of the five after-hired Hispanics. As the Court stated in ruling on the defendants' summary judgment motion, "[i]t *may* be inferred that these Mexican-Americans were hired at least partially in response to this litigation" (emphasis added) [Filing # 85 in "Ramirez"; Filing # 49 in "Leeds"].

The problem here is that the plaintiffs have really done no more than point out the five after-hired Hispanics and asked the Court to infer that they were hired to defeat the plaintiffs' disparate impact claims in this lawsuit. The plaintiffs, however, have failed to prove in any way that this actually was the case.

The defendants *did* offer a good explanation for five after-hired Hispanics. The evidence showed that while the eligible list was established on October 11, 1976, the first group of firefighters was hired nine months later on July 16, 1977. Eleven persons were hired in that first group. Of those eleven, one was Hispanic. The second group of firefighters was hired on July 17, 1978. In the second group, ten persons were hired and two were Hispanic. The third group of firefighters was hired on October 16, 1978. Twenty-eight persons were hired in the third group, with three

---

**23.** Some of the pertinent dates should be clarified. Plaintiff Ramirez was rejected for employment on November 17, 1976. Plaintiff Leeds was rejected on June 21, 1978. Ramirez filed his federal court complaint on May 8, 1978. Leeds filed a similar complaint on August 10, 1978. It appears, therefore, that plaintiffs have chosen June 1, 1978, as a cut-off point representative of when the plaintiffs initiated the instant litigation.

being Hispanic. The fourth and final group of firefighters off the 1976–1978 eligible list was hired on October 23, 1978. No Hispanics were hired in this last group.

Defendants' witness, Michael Mendenhall, explained the hiring of Hispanic applicants in the four different groups. He stated that the Hispanics in the second and third groups were hired after this litigation was initiated solely because they did not rank high enough on the eligible list to be referred and hired in the first class of firefighters hired in July of 1977 [Tr. 409:18 to 412:4]. Mendenhall stated that the Hispanic applicants tended to be in the middle portion of the 1976–1978 eligible list, and that thus they had a much greater chance of being hired in the second and third groups of firefighters [Tr. 411:19 to 412:4]. This likewise explains why no Hispanics were hired in the fourth and final group, i.e., by that time all possible minority referrals had been exhausted [Tr. 411:7–16].

Plaintiffs have consistently maintained that the City hired the five Hispanic firefighters after June 1, 1978, in order to defeat plaintiffs' disparate impact claim. Mr. Mendenhall, the City's witness, offered a very reasonable explanation of the five after-hired Hispanics, to the effect that their hiring had no relationship to plaintiffs' initiation of this litigation. The plaintiffs conspicuously failed to counter Mr. Mendenhall's testimony.[24]

In light of the state of the evidence, the Court believes that a statistical analysis of the *entire* 1976–1978 eligible list must be made in order to evaluate disparate impact. A brief *caveat* should be added. The Court certainly is not adopting a rule which may be read by future employment discrimination defendants as saying that the "deck" can be "stacked" in their favor by hiring minorities after a § 2000e disparate impact case is filed. This Court still abides by the rule that disparate impact must be determined before a defendant has an opportunity to respond to litigation, i.e., in most cases, the most probative cutoff dates for determining hiring statistics are the date of rejection and the date that an administrative or judicial employment discrimination claim is filed. *Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 425 (8th Cir. 1970). The case at bar, however, involves a different situation. Since there is no evidence that the defendants responded to this litigation by "stacking the deck" with after-hired Hispanics, the entire 1976–1978 eligible list should be evaluated for disparate impact. This approach, the Court feels, yields the most probative data about the defendants' hiring practices. Furthermore, this analytical approach comports with the general mandate that, in a disparate impact case of this kind, a prima facie case depends on proof that the testing process selects applicants for hire in a racial pattern significantly different from that of the "pool" of applicants. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). *But see Perham v. Southwestern Bell Telephone Co.*, *supra*, 433 F.2d at 425.[25]

---

**24.** The direct examination of Mr. Mendenhall regarding applicant flow data appears at pages 408–412 of the trial transcript. Cross-examination by the plaintiffs' counsel appears at pages 418 and 419. That cross-examination failed to even address Mendenhall's explanation of the Hispanic applicant flow data. As part of their post-trial brief, plaintiffs submitted a rebuttal to *some* parts of Mendenhall's statistical analysis at trial. But, this rebuttal noticeably does not address itself to Mendenhall's explanation of why Hispanics were more likely to be hired in the second and third groups of firefighters.

**25.** The Court agrees with the defendants that certain language in *Parham* must be viewed as modified by later language in *Moody.* In *Par-*

*ham,* the Eighth Circuit stated that the crucial issue in a Title VII lawsuit is whether the plaintiff establishes hiring bias at the time of his rejection for employment and subsequent complaint to the EEOC, not the employment practices utilized some years later. *Parham v. S.W. Bell Tel. Co., supra,* 433 F.2d at 425. In *Moody,* the Supreme Court said to look at the "pool of applicants" to ascertain impact. The Court's research indicates that the pertinent language in *Parham* has not yet been overruled. Still, the Court accepts the defendants' suggestion as to what *Moody* means in this case. That is, if an examination process produces a pool of applicants (and, due to the life of the eligible list which defines that pool it is intended that applicants will be hired from that pool over a

It will be recalled that the parties stipulated to the following statistics relative to the 1976–1978 eligible list:

|  | White Males | Mexican-American Males | Others | Total |
| --- | --- | --- | --- | --- |
| Eligible | 393 | 13 | 38 | 444 |
| Referred | 138 | 13 | 38 | 189 |
| Hired | 56 | 6 | 2 | 67 |

These figures clearly demonstrate that Mexican-Americans suffered no disparate impact in the City's hiring of firefighters off the 1976–1978 eligible list. Mexican-Americans actually fared much better than their white counterparts. That is, only 14.2% of the white males were hired off the list, while 46.2% of the Hispanics were hired [Ex. # 59, Table III]. Minority applicants in general did better than the white applicants, with a 15.7% hiring rate. *Id.*

Since there is no "bottom line" disparate impact on Mexican-Americans, it is not really necessary for the Court to examine how that class of applicants fared on the polygraph examination component of the City's firefighter hiring procedure. *See Rule v. International Association of Bridge, Structural and Ornamental Iron Workers, Local Union No. 396*, 568 F.2d 558, 565 n. 10 (8th Cir. 1977). Still, in view of the fact that the parties have put so much emphasis on that now defunct component of the hiring process, the statistics deserve some discussion. The evidence from the 1976–1978 eligible list showed that 24.6% of the referred white male applicants were rejected on the basis of their polygraph reports, while 30.8% of the referred Spanish-surnamed applicants were rejected on that basis [Ex. # 59, Table VII]. The differential of 6.2% is not significant,[26] especially in light of the extremely small statistical pool.[27]

The Court also need not examine the evidence regarding the level of employment of Mexican-Americans by the City as fire-fighters in comparison to the percentage of Mexican-Americans in this geographical area [Ex. # 59, Tables VIII and IX]. As already discussed, plaintiffs have maintained consistently that the hiring statistics should be examined as of June 1, 1978, the approximate date that this litigation was initiated, and prior to the hiring of five additional Hispanic firefighters. The Court has held that, since the five after-hired Hispanics were not hired in response to litigation, the statistics should be examined in view of the larger time frame of hiring off the 1976–1978 eligible list. In arguing for June 1, 1978, as the critical date, the plaintiffs conceded that the five after-hired Hispanics succeeded in bringing the composition of the Fire Division's work force to the percentage of Hispanics in the Omaha geographical area, and that thus there was no adverse impact on Hispanic applicants for that two year hiring period. *See* Plaintiffs' Final Argument (Post-Trial Brief) at 3 and 6. Therefore, the Court need not analyze the proffered population statistics.

### V. *Summary and Conclusions of Law*

#### A. *§ 2000e Disparate Impact Claim Against the City*

As the immediately foregoing discussion demonstrated, the plaintiffs failed to establish a prima facie case of disparate impact. Viewing the entire 1976–1978 firefighter eligible list as the relevant "pool" of applicants, *Albemarle Paper Co. v. Moody*,

period of time), disparate impact must be measured at the time hiring from that pool is completed and not before, so long as there is no evidence supporting an inference that minority applicants were hired in response to a claim of discrimination made during the hiring period.

**26.** See 29 C.F.R. § 1607.4(D) (1979); *see, e.g., Moore v. S.W. Bell Tel. Co.*, 593 F.2d 607, 608

(5th Cir. 1979) (*per curiam*); *see generally*, 3 A. Larson, *Employment Discrimination* §§ 74.-51–74.60 (1980).

**27.** *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20, 97 S.Ct. 1843, 1856, n.20, 52 L.Ed.2d 396 (1977).

422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), it is clear that, while the hiring procedure utilized by the City did select Mexican-American applicants for hire in a pattern significantly different from that of the applicant pool, the disparity actually worked in favor of the Mexican-Americans. Since there has been no showing of "bottom line" disparate impact, the fact that Mexican-Americans were only 6.2% less successful than whites in the polygraph examination part of the hiring process is not very meaningful. *See Rule v. International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 396*, 568 F.2d 558, 565 n. 10 (8th Cir. 1977); 29 C.F.R. § 1607.4(C) (1979).

Because the plaintiffs did not establish a prima facie case, the Court need not discuss the defendants' proffered evidence regarding "manifest relationship," *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), and "business necessity," *Dothard v. Rawlinson*, 433 U.S. 321, 331 n. 14, 97 S.Ct. 2720, 2728 n.14, 53 L.Ed.2d 786 (1977). Nor is it necessary for the Court to deal with the evidence proffered by the plaintiffs regarding "reasonable alternative" hiring procedures. *Albemarle Paper Co. v. Moody, supra*, 422 U.S. at 425, 95 S.Ct. at 2375.

### B. § 2000e Disparate Treatment Claim Against the City

The defendants essentially conceded that plaintiffs had established a prima facie showing of disparate treatment under the *McDonnell Douglas* formula.[28] Upon making that concession, however, the defendants successfully rebutted the adverse inference raised by plaintiffs' prima facie showing. They carried this burden by articulating a legitimate, nondiscriminatory reason for rejecting plaintiffs' employment applications, i.e., the decisions to reject plaintiffs' applications were based on unfavorable polygraph examination reports which dealt with areas of behavior almost totally unrelated to race or national origin. The plaintiffs failed to present any convincing evidence regarding "pretext."

### C. § 1983 Claim Against the City

■ This claim is governed by *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The City conceded that the hiring procedures utilized for the 1976–1978 eligible list constituted "official policy," regardless which City officials developed those procedures. The sole factual issue involved is whether the persons who developed the City's hiring procedures, especially with respect to the polygraph examination, were motivated by a discriminatory purpose. The Court concludes that the requisite intent to discriminate was clearly lacking on the part of the City's officials. Plaintiffs have therefore failed to establish a prima facie case.

### D. § 1983 Claim Against the Individual Defendants

Discriminatory intent is also a crucial element of the § 1983 claim against the individual defendants. For the reasons discussed immediately above, no prima facie showing has been made on this claim.

### E. § 1981 Claim Against the Individual Defendants

In light of what the Court has already said about the § 2000e disparate treatment and § 1983 claims, no prima facie showing of a § 1981 claim has been made by the plaintiffs.

### VI. Conclusion

All claims of employment discrimination against the various defendants should be dismissed, as the plaintiffs have failed to satisfy their burden of proof. An Order shall issue contemporaneously with this Memorandum.

---

**28.** *See* footnote 21, *supra.*